IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | CASE NO. 4:11CR51 |
| v. | § | |
| | § | |
| H.M. GRIFFIN, JR. (1) | § | |
| TAMIKA LASHON LEONARD (2) | § | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
DENYING DEFENDANT'S MOTION TO SUPPRESS**

This matter having been referred by the Honorable Richard A. Schell, the Court has considered Defendant H.M. Griffin Jr.'s Motion to Suppress Evidence (Dkt. 34) and Amended Motion to Suppress (Dkt. 39). Prior to the hearing, the Court granted Defendant Tamika Lashon Leonard leave to join in the motions (*see* Dkt. 38). After considering the evidence presented and the arguments of counsel at the July 19, 2011 hearing, the Court finds that the motions (Dkts. 34 and 39) should be DENIED as to both Defendants.

Defendant H.M. Griffin is charged in this matter with felon in possession of a firearm, a .380 handgun and a 12-gauge shotgun. Defendant Tamika Leonard is charged in this matter with felon in possession of a firearm, a 12-gauge shotgun. In the motions to suppress, Griffin and Leonard seek to suppress the evidence discovered on February 14, 2011 during the execution of an arrest warrant for Griffin at Leonard's home on 1829 Blossom Trail, Plano, Texas. The arrest warrant for Griffin was issued on September 13, 2010, for a state jail felony possession of less than one gram of a controlled substance.

1

Officers found a .380 handgun and a 12-gauge shotgun while executing the arrest warrant. The officers eventually found Griffin hiding in a bedroom closet. He was removed, handcuffed, and taken to the kitchen.

While searching for Griffin, the officers claim to have found a shotgun and handgun. How the weapons were discovered is disputed by the parties. A search warrant for the house was not issued until after the guns were found. In the written motions, Defendants argue that the search was conducted around 1:30 p.m., according to several officer reports and video surveillance, which is prior to the search warrant. However, the Government argues it was not conducted until after the undersigned issued a search warrant for the premises at 2:06 p.m. Officers found $2,600.00 in cash, ammunition, the firearm, shotgun, and crack cocaine.

The Government alleges that the handgun and shotgun were found in plain view while searching for Griffin. Defendants claim the evidence was the result of an unlawful search. Defendants contend that the search was conducted before obtaining a search warrant, was not incident to arrest because Defendants had been removed from the premises by the time the search was conducted.

### EVIDENCE PRESENTED

At the hearing, the Court heard testimony of several witnesses and reviewed portions of the video surveillance footage. Defendant Tamika Leonard testified about the circumstances surrounding Griffin being found at her home. According to Leonard, she and Griffin have been married since January 15, 2009, but they have never lived together. Leonard stated that she rents the residence at 1829 Blossom Trail, Plano, Texas, that only her name is on the lease, and that she is the

only one who pays rent.  Leonard stated that Griffin does not have a key to the home on Blossom Trail, that he infrequently stays the night there, and that he last stayed the night four months ago.  She testified that on the night prior to the arrest – February 13, 2011 –  she and Griffin went to the Choctaw Casino in Durant, Oklahoma, after which Griffin "stayed overnight" with her.

Sergeant Russel May of the McKinney Police Department also testified.  He stated that he was the case officer assigned to execute the arrest warrant against Griffin.  *See* Govt. Ex. 2.  Sergeant R. May testified that he received information that Griffin was at 1829 Blossom Trail on the morning of February 14, 2011.  Sergeant R. May arrived at the residence with an arrest team of 8 or 9 officers.  Upon knocking, Sergeant R. May stated he heard some rustling, and it took a few minutes before Defendant Tamika Leonard opened the door.  The officer subsequently announced that he was with the police department and asked "is H.M. here," to which Leonard responded "yes, he's in the back."  The arrest team entered the residence and after the first sweep, the officers did not find Griffin.  R. May testified that, upon the initial search for Griffin, a black colored short barrel shotgun was located in the closet in the master bedroom.

Sergeant R. May testified that, after the first attempted search for Griffin, Leonard told him, "he must have gone out the back or he must have left."  The team conducted a second search, and Deputies Adam Bradshaw and William May found Griffin hiding in the northeast bedroom closet with a "dark colored plastic bag sitting on top of him."  According to Sergeant R. May, the deputies forcibly removed Griffin and laid him face forward on the floor.  Sergeant R. May also testified that Deputy Bradshaw stated "there's a gun," at which time he came into the room and saw a "chrome colored handgun" in plain view.

Sergeant R. May's report stated that the gun was found in a "search incident to arrest" where Griffin was hiding. When questioned about this, he testified that this was a "poor choice of words" and the "officer that assisted [W. May] in pulling him out of the closet was able to see the handgun from standing in the room looking into the closet." According to Sergeant R. May, the handgun was found on the floor to the back right side of the closet "in the immediate area where he was pulled from." The Government offered a photograph of the .380 handgun resting on the carpet in the closet. *See* Govt. Ex. 7. R. May testified that the position of the gun was consistent with Griffin sitting on the gun or holding it prior to being removed from the closet.

Around 10:50 a.m., once Leonard denied consent to search the premises, Sergeant R. May went outside to call Agent Patterson with the A.T.F. to inform him about the items discovered and asked him to come to the location to take photos of the items. Sergeant R. May testified that he read Leonard her *Miranda* rights, after which time she told him that she was a convicted felon on probation and that her mother purchased the shotgun for her protection. According to Sergeant R. May, after Griffin and Leonard were both taken into custody, the officers waited outside of the residence until the search warrant was issued. While officers were outside, Leonard's mother, Ms. Coit, came by for 15-20 minutes.

Sergeant R. May testified about Government Exhibits 12-23, photos of items found in the house after the search warrant was issued. A lockbox containing ammunition was in the master bedroom under the bed containing ammunition. *See* Govt. Ex. 12. May identified the box as Griffin's because the key to it was on Griffin's keychain. Officers also found crack cocaine in two locations – a pink Nike shoe hanging on the door and in another shoe in the master bedroom closet.

4

*See* Govt. Exs.14 and 15. They also found Griffin's Texas driver's license with his mother's address in a shoe. *See* Govt. Ex. 17. In the master bedroom, there were shotgun shells that fit the 12-gauge shotgun. *See* Govt. Ex. 19. Also, there was a magazine containing four rounds of live ammunition for the .380 handgun in the dresser drawer in the bedroom where Griffin was hiding. *See* Govt. Ex. 20. And, several one-hundred dollar and twenty dollar bills were located between a mattress and box spring. *See* Govt. Exs. 21-23. At the hearing, the Government also offered excerpted portions of tape from Leonard's surveillance camera.

Deputy William May with the U.S. Marshals Service Task Force also testified about the day of Defendants' arrest. Deputy W. May testified that he found the shotgun while looking in the master bedroom closet for Griffin after moving clothes to see if Griffin was behind them. He also testified that he was ultimately the one to find Griffin in the other closet. While conducting the second search of the house, May stated, he "removed a trash bag with clothes in it and observed a foot." He instructed Griffin to show his hands, he did, and officers pulled him out. W. May testified that he did not immediately see the gun upon removing Griffin.

Deputy Marshals David Ramirez and Osvaldo Ortiz with the U.S. Marshals Service also testified. Both stated that they wrote in their reports that they assisted in or conducted a search warrant around 1:30 p.m., which is before the search warrant was issued at 2:06 p.m. In explaining the time discrepancy, Deputy Ramirez testified he had been there for several hours and that was his best time estimate. Deputy Ortiz testified that the time listed in his report was around the time that he arrived at the scene to assist, not the time he actually assisted or the time the search commenced. Both were certain that the search did not commence until they received a call that the search warrant

5

had been signed.

Deputy Adam Bradshaw also testified. He was present when Deputy W. May found Griffin, and he stated that he saw the handgun in plain view. Deputy Bradshaw testified he looked back in the closet immediately after Griffin was removed and saw the handgun. He testified that, once Griffin "was secured and handcuffed [he] looked back into the closet and... [saw] the handgun" and he did not move any clothing to see it. According to Bradshaw, he immediately told W. May that he saw the gun.

Detective Brent Walterscheid testified that he arrived at the home a little before 2:00 p.m. and saw other officers standing in the front yard outside. He testified that he did not take photos of the premises until after the search warrant was issued.

Deputy Paul Denton with the U.S. Marshal Service also testified, and his testimony corroborates Officer Walterscheid's testimony. According to Denton, he arrived at the house around 1:30 p.m. and officers were in the front lawn waiting for the warrant. Once the case agent said the warrant was signed, the officers entered the house. Deputy Denton discovered the currency "between the mattress and box spring" and the magazine "in a drawer in the same bedroom." Though his report stated he assisted in a search warrant at 1:30 p.m., he explained that was the time he personally arrived on the scene, not necessarily the time that he started the search.

Agent Joseph Patterson with the A.T.F. testified. According to Agent Patterson, Sergeant R. May called him, asking him to come to the residence and bring a camera. Upon arriving at the scene, Agent Patterson took photos of the previously discovered handgun, shotgun, and surveillance monitor. He also spoke with Leonard and asked her to consent to a search, which she respectfully

declined. According to Patterson, Leonard also told him she was a convicted felon on probation. She said the shotgun was "the only weapon in the house and her mother had brought it to the house."

Agent Patterson prepared the search warrant affidavit. After obtaining the search warrant and returning to the residence, Agent Patterson spoke with Leonard's mother, Ms. Coit. She told him there had been an attempted break in and that she got her daughter the gun for protection, though she knew Leonard was a convicted felon.

The defense then called Defendant Griffin to the stand. Griffin testified that, when he saw the officers approach the house, he hid in the back closet because "he didn't know what they were coming to arrest him for." Griffin testified that he was not sitting on the floor under bags as W. May testified, but rather, he was "standing up behind the clothes in the closet." According to Griffin, he is approximately 6'1" or 6'2". He testified that the officers looked in the closet the first time (while he remained hidden), but did not see him until the second time. According to Griffin, the officers said "come out," and he did. Defendant denies being forcibly removed from the closet. According to Griffin, once he was out of the closet, officers cuffed him and took him to the kitchen without removing anything from the closet. He testified that he observed officers going to the back room, but was not actually able to see them from the kitchen.

The defense also offered the testimony of Leonard's mother's Anniette Coit, who arrived after officers found the guns. Coit said the shotgun was hers and that she left the shotgun in the closet while Leonard was out of town. She also testified that the gun was always kept in the case and would not be left out in plain view. When showed the picture of the gun case, she conceded that it appeared floppy and may not have had a gun inside. Def.'s Exhibit 2. She also testified that she

7

never told the two officers that she gave her daughter the gun for protection.

## ANALYSIS

The first legal issue raised by the Government is whether Griffin has standing to challenge the search. A defendant must show he had a legitimate expectation of privacy in the area searched to establish a Fourth Amendment violation. *U.S. v. Ibarra*, 948 F.2d 903, 905 (5th Cir. 1991). In determining whether a legitimate expectation of privacy exists, the Court should examine "whether the defendant has a possessory interest in the thing seized or the place being searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy and whether he was legitimately on the premises." *Id.* at 906. The *Ibarra* court found that because the defendants did not own, lease or live in the house they did not have a reasonable expectation of privacy. *Id.* The Fifth Circuit has recognized that Fourth Amendment protections are "presumably applicable" to premises owned or used by an individual, thus creating a presumption of subjective and reasonable expectation of privacy. *U.S. v. Vega*, 221 F.3d 789, 796 (5th Cir. 2000). "An overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Minnesota v. Carter*, 525 U.S. 83, 90, 119 S. Ct. 469, 473, 142 L. Ed.2d 373 (1998). Even if there for only a night, the inquiry is focused on whether the person has a legitimate expectation of privacy in the place searched. *Id.*

Here, it is undisputed that Griffin does not own or control the residence searched. The Government has argued that Griffin has no standing to challenge the search because he could not

have a legitimate expectation of privacy in Leonard's home. The testimony presented indicates that Griffin's name was not on the lease, he did not pay rent, he did not have a key to the home, and he never lived with Leonard there. It also appears that, according to Leonard herself, his overnight visits were not all that frequent. Such factors would weigh against a reasonable expectation of privacy. On the other hand, however, Griffin's car was in the garage at the time of the search and his driver's license was found hidden in a shoe within the residence – these factors are more indicative of a subjective expectation of privacy. Because the Court finds that, even if Griffin had standing to challenge the search, the search and seizures were valid, the Court need not reach the issue of standing and will find for purposes of this motion that Griffin has established a reasonable expectation of privacy.

The Court next turns to whether the shotgun and handgun were properly seized. The protective sweep doctrine allows government agents, without a search warrant, to conduct a quick and limited search of premises for the safety of the agents and others present at the scene. *United States v. Rodriguez*, 601 F.3d 402, 405 (5th Cir. 2010). To be constitutionally valid, (1) the police must not have entered (or remained in) the home illegally and their presence within it must be for a legitimate law enforcement purpose; (2) the protective sweep must be supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene; (3) the legitimate protective sweep may not be a full search but may be no more than a cursory inspection of those spaces where a person may be found; and (4) the protective sweep may last no longer than is necessary to dispel the reasonable suspicion of danger, and no longer than the police are justified in remaining on the premises. *Id.* at 405-06. A court should consider the totality of the

circumstances surrounding the officers' actions in determining whether an officer had a reasonable, articulable suspicion sufficient to justify a protective sweep. *Id.* at 406. In conjunction with the protective sweep doctrine, the plain view exception allows police to seize items where: (1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was immediately apparent; and (4) the police had a lawful right of access to the item. *Id.* at 407.

Here, testimony indicates that Leonard told officers – who had an arrest warrant for Griffin in hand – that Griffin was inside. Such a statement without question gave them a reasonable articulable suspicion that he would indeed be inside. Therefore, the Court finds that the protective sweep, as conducted, was justified. *See id.* (holding protective sweep was justified when officers responded to 911 domestic disturbance call, were aware of a previous domestic disturbance call at the residence from the year before, found children in the residence who were not reported by the callers or dispatcher, and were aware of the alleged presence of a firearm in the residence); *United States v. Getachew*, 364 Fed. Appx. 931, 933 (5th Cir. 2010) (holding protective sweep was justified when officers arrived within minutes of being dispatched to a robbery in progress, were told a victim had seen men inside the house with guns, and did not know whether other suspects were still in the house).

According to the testimony before the Court, the shotgun was found during the first sweep of the house. Defendant, by his own admission, remained hidden from view during that search. The Court is not convinced by Coit's testimony that the shotgun was inside a case. Even if it had been within a case, officers were required to search in the closets of the home because Griffin remained

10

hidden from view. There is no other credible testimony or evidence that would indicate that the shotgun was not in the officers' plain view as they conducted the protective search of the house in search of Griffin. Therefore, the Court finds that the discovery of the shotgun in the course of the protective sweep of the house and search for Griffin was lawful and should not be suppressed.

Where there is greater dispute is when and how the handgun was discovered. It is clear that it was not seen until Griffin was located hiding in a bedroom closet – after the house was searched for him for a second time. Griffin claims that he was standing in the closet and that he came out of the closet voluntarily, making the removal of bags of clothes and subsequent discovery of the handgun on the floor unwarranted. Officers' version of the discovery of the handgun is quite different. Various officers testified that bags of clothes had to be removed from the closet to uncover Griffin, that Griffin had to be forcibly removed, and that such removal revealed the handgun on the floor.

Having considered the testimony in conjunction with the photographic evidence, the Court finds that Griffin's contention that he was standing in the closet is not credible. Griffin, by the Court's observation and his own admission, is over 6' tall. The rod and shelf in the closet in which he was found make it seemingly unlikely for anyone of that height to stand straight in a closet. *See* Govt. Ex. 6. Further, the contents of the closet would make it very difficult for him to remain undetected from officers during the first sweep of the house if he were merely standing behind clothes. He was not found until the second search. The Court finds the officers' testimony that Griffin was hiding under the clothes with a gun underneath him to be more credible, and the handgun was lawfully seized pursuant to the plain view doctrine. The Court notes that, had Griffin not

11

decided to hide from officers when they entered the home and instead immediately surrendered to them, it is possible that no search of the home or closets would have been warranted and the weapons not discovered, nor probable cause for the search warrant formed. Griffin (and Leonard) are nonetheless now bound by the consequences of his choices to avoid initial detection.

Moreover, even had the firearms not been discovered in the course of the protective sweep– and Defendant Griffin voluntarily emerged from the closet as he claims (an allegation the Court does not find credible here) – the discovery of the handgun would likely still be lawful. The court in *Getachew* held that a reasonable suspicion of danger justified a protective sweep, but that officers exceeded the scope of the protective sweep by opening a kitchen drawer and thereby observing a firearm. 364 Fed. Appx. at 933. However, the court held that the district court "did not err in determining that the firearm was nevertheless admissible under the independent-source exception to the exclusionary rule." *Id.* The independent-source exception "dictates that evidence obtained from an illegal search is admissible if the same evidence was also obtained from a lawful source independent of the illegality." *United States v. Runyan*, 290 F.3d 223, 235 (5th Cir. 2002). In *Getachew*, the officers executed a warrant "based on the responding Officers' plain-view observations of scales and marijuana residue, as well as the very strong marijuana odor in the residence" and "there was no reference to the firearm in the affidavit supporting the search warrant." *Getachew*, 364 Fed. Appx. at 933-34. The *Getachew* court notes that the "Government therefore established: the Officers would have sought a warrant in the absence of the illegal search; and, the warrant would still have been issued because it was supported by ample probable cause." 364 Fed. Appx. at 934. Here, the discovery of the shotgun would be sufficient basis for probable cause to

search the premises for other weapons and the handgun would have been found either way.

Finally, the Court addresses Defendants' concern that, after the house was secured and the protective sweeps were conducted, officers prematurely entered to conduct a full search prior to the issuance of the search warrant. Defendants' argument is premised on the time/date stamps on the surveillance video on the date of the search and the time marked on some of the officers' reports. That video indicates that officers entered home at approximately 1:22 p.m. to search the house. The search warrant was not issued until approximately 2:06 p.m.

At the hearing, the Government offered evidence through Sergeant R. May to show that the time on the surveillance camera was exactly one hour behind. The video shows the sun rising at 6:12 a.m. on February 14, 2011. The Court takes judicial notice of the fact that historical records indicate that it rose at 7:12 a.m. that day in Plano, Texas. *See* Govt. Ex. 24. The video showed officers arriving at 9:41 a.m. on video surveillance (in actuality,10:41 a.m.). At 12:10 p.m. in real time, a female officer arrived to pat down Leonard (this time is corroborated by the officer's call out) and Leonard was subsequently taken to jail. The video shows officers waiting in the front lawn and at 13:21, video time, gloving up to search the residence, which would be 2:21 p.m. in real time.

As to the times written on some of the officers reports, the Court finds that such discrepancies were either explained as estimates, arrival (but not entrance) time, or simply careless preparation of reports. There is simply nothing to indicate that the officers conducted the search prior to the issuance of a warrant. Having considered all of the evidence presented, the Court finds that the officers properly entered the house for the full search after the issuance of the warrant.

Defendants' Motion to Suppress Evidence (Dkt. 34) and Amended Motion to Suppress (Dkt. 39) should be DENIED.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(c).

Failure to file written objections to the proposed findings and recommendations contained in this report within the time period set forth above shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 5th day of August, 2011.**

                                                DON D. BUSH
                                                UNITED STATES MAGISTRATE JUDGE